YVONNE M. SCHULTE, State Bar No. 237868
*yvonne.schulte@clydeco.us*
BRADLEY R. HARDING, State Bar No. 299842
*brad.harding@clydeco.us*
CLYDE & CO US LLP
355 S, Grand Avenue, Suite 1400
Los Angeles, California 90071
Telephone: (213) 358 7600
Facsimile: (213) 358 7650

Attorney for Plaintiff/Petitioner
LIBERTY INSURANCE CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIBERTY INSURANCE CORPORATION,<br><br>            Plaintiff/Petitioner,<br><br>    v.<br><br>PROTECTED INSURANCE PROGRAM FOR SCHOOLS & COMMUNITY COLLEGES JOINT POWERS AUTHORITY<br><br>            Defendants/Respondents. | Case No.<br><br>**PETITION TO CONFIRM ARBITRATION AWARD** |

Petitioner Liberty Insurance Corporation ("Liberty") alleges as follows:

## INTRODUCTION

1.      Respondent PROTECTED INSURANCE PROGRAM FOR SCHOOLS & COMMUNITY COLLEGES JOINT POWERS AUTHORITY ("PIPS") is a Joint Powers Authority formed in California pursuant to Government Code § 6500, *et seq*.

CLYDE & CO US LLP
355 S. Grand Avenue Suite 1400
Los Angeles, CA 90071
Telephone: (415) 213-358-7600

2.      On December 6, 2022, PIPS filed a Demand for Arbitration in connection with an underlying workers' compensation claim involving a former employee of Beverly Hills Unified School District ("claimant").

3.      In the Demand for Arbitration, PIPS sought $246,728 in reimbursement of claim expenditures from Liberty under an excess policy issued to PIPS, as well as $152,000 in prejudgment interest.

4.      Liberty hereby seeks an order from this Court confirming the arbitration award dated July 26, 2023 rendered in an arbitration before Mark L. Kahn of Altman, Blitstein & Blinder, and entry of judgment thereon pursuant to 9 U.S.C. § 13.

## PARTIES

5.      Petitioner Liberty is a corporation that is incorporated under the laws of the State of Illinois, and maintains its principal place of business in Boston, Massachusetts.

6.      Respondent PIPS is a Joint Powers Authority formed in California pursuant to Government Code § 6500, *et seq*.  As such, respondent is a citizen of California.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between a citizen of California and a citizen of Illinois, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      Venue is proper in this Court because the arbitration took place in Los Angeles, California.

## FACTS

9.      On December 6, 2022, PIPS filed a Demand for Arbitration in connection with an underlying workers' compensation claim involving a former

CLYDE & CO US LLP
355 S. Grand Avenue Suite 1400
Los Angeles, CA 90071
Telephone: (415) 213=358-7600

employee of Beverly Hills Unified School District pursuant to a confidential arbitration agreement between the parties.

10.    According to the Demand for Arbitration, the claimant suffered three interrelated workers' compensation injuries: a specific injury on September 24, 2010; a specific injury on October 14, 2011; and a cumulative trauma ("CT") from August 2005 to October 14, 2011.

11.    The Demand for Arbitration also claimed that only the September 24, 2010 specific injury was covered under the Liberty Policy but that the other two non-covered injuries were a "compensable consequence" of the covered injury.

12.    Accordingly, PIPS sought 100% of the claim expenditures related to the covered September 24, 2010 specific injury, as well as a portion of the claim expenditures related to the October 14, 2011 specific injury and the CT claim.

13.    The total amount of claim expenditures sought by PIPS totaled $246,728.  PIPS also sought $152,000 in prejudgment interest.

14.    In its response to the Demand for Arbitration, Liberty argued that (1) PIPS released the CT claim by way of a separate and confidential settlement with Liberty; (2) the October 14, 2011 specific injury was not a "compensable consequence" of the covered September 24, 2010 specific injury but rather a separate, discrete injury; (3) the CT claim was not a "compensable consequences" of the covered September 24, 2010 specific injury because it began in August 2005, many years before the covered September 24, 2010 specific injury; (4) Liberty is only required to reimburse PIPS for claims covered under the Liberty Policy; and (5) PIPS's position contradicted a Workers Compensation Appeals Board ("WCAB") Stipulation that it entered into, in which it dismissed all body parts other than the right shoulder[1] in connection with the covered September 24, 2010 specific

---

[1]    As well as accompanying psych.

Case No. _____

PETITION TO CONFIRM ARBITRATION AWARD

1 injury.  In other words, PIPS could not take a legal position in the arbitration that
2 contradicted the position it took at WCAB.

3    15.  The arbitrator issued an arbitration award on July 26, 2023.  Attached
4 hereto as Exhibit A is a true and correct copy of the award issued by Mark L. Kahn
5 of Altman, Blitstein & Blinder dated July 26, 2023.

6    16.  In the award, the arbitrator made the following rulings:

7      • The CT claim is a separate and distinct injury and not a
8      compensable consequence of the September 24, 2010 injury;

9      • The October 14, 2011 specific injury is a separate and distinct
10      injury and not a compensable consequence of the September
11      24, 2010 injury; and

12      • PIPS is not entitled to prejudgment interest pursuant to Civil
13      Code § 3287.

14    17.  The Award has not been set aside or suspended by a competent
15 authority.

16    18.  Pursuant to 9 U.S.C. § 9, Petitioner has brought this action within one
17 year after the Award was made on July 26, 2023.

18 **COUNT ONE**

19 (**Confirm Arbitration Award**)

20    19.  Liberty repeats and realleges paragraphs 1 through 18 hereof, as if
21 fully set forth within.

22    20.  The Award found that the CT claim is a separate and distinct injury
23 and not a compensable consequence of the September 24, 2010 injury.

24    21.  The Award found that the October 14, 2011 specific injury is a
25 separate and distinct injury and not a compensable consequence of the September
26 24, 2010 injury.

27    22.  The Award found that PIPS is not entitled to prejudgment interest
28 pursuant to Civil Code § 3287.

CLYDE & CO US LLP
355 S. Grand Avenue Suite 1400
Los Angeles, CA 90071
Telephone: (415) 213=358-7600

Case No. _____

PETITION TO CONFIRM ARBITRATION AWARD

23.    By reason of the foregoing, the court should issue an order confirming the arbitration award annexed hereto as Exhibit A by Mark L. Kahn of Altman, Blitstein & Blinder dated July 26, 2023, and direct that judgment be entered thereon.

WHEREFORE, Liberty respectfully requests that this Court:

1.    Issue an order pursuant to 9 U.S.C. § 9 confirming the arbitration award annexed hereto as Exhibit B by Mark L. Kahn of Altman, Blitstein & Blinder dated July 26, 2023.

2.    Enter judgment thereon pursuant to 9 U.S.C. § 13.

3.    Award Liberty such other and further relief as this Court deems just and proper.

Dated: July 25, 2024                    CLYDE & CO US LLP

By:    _/s/ Yvonne M. Schulte_
Yvonne M. Schulte
Bradley R. Harding
Attorneys for Plaintiff/Petitioner LIBERTY
INSURANCE CORPORATION

CLYDE & CO US LLP
355 S. Grand Avenue Suite 1400
Los Angeles, CA 90071
Telephone: (415) 213-358-7600

Case No. _____

PETITION TO CONFIRM ARBITRATION AWARD

Exhibit A

1  MARK L. KAHN, ARBITRATOR
   ALTMAN, BLITSTEIN & BLINDER
2  A Professional Corporation
   16255 Ventura Boulevard, Suite 1110
3  Encino, CA 91436-2319
   (818) 995-0080
4

5

6  **PROTECTED INSURANCE PROGRAM**
   **FOR SCHOOLS & COMMUNITY**
7  **COLLEGES JOINT POWERS**
   **AUTHORITY,**
8
                    **CLAIMANT,**
9

10 **VS.**                                    **ARBITRATOR'S FINDINGS**

11 **LIBERTY INSURANCE CORPORATION,**

12               **RESPONDENT**.

13

14        The above-captioned matter having been set for Arbitration on January 17, 2023, before

15 Mark L. Kahn, Arbitrator, the parties having reached Stipulations, Issues and admitted Exhibits

16 into evidence and have agreed to submit the matter on the present record,

17 The Arbitrator finds as follows:

18                              **FINDINGS**

19        1.    The Arbitrator finds the claim for the continuous trauma injury from August 2005

20 through October 14, 2011, is a separate and distinct injury and not a compensable consequence of

21 the specific injury of September 24, 2010.

22        2.    The Arbitrator finds the the claim for the specific injury of October 14, 2011 is a

23 separate and distinct injury and not a compensable consequence of the specific injury of September

24 24, 2010.

25        3.    The Arbitrator finds that the applicant sustained a specific injury on September 24,

26 2010, a specific injury on October 14, 2011, and a continuous trauma from August 2005 through

27 October 14, 2011, all of which are separate and distinct injuries.

28 / / /

                                    -1-

4.     The Arbitrator finds that regarding the issue if the claim for a continuous trauma injury from August 2005 through October 14, 2011 is found to be a compensable consequence of the specific injury of September 24, 2010, are the injuries and benefits covered by the terms of the insurance policy issued by Liberty Mutual to PIPS, the Arbitrator does not decide this issue as the Arbitrator found that the continuous trauma claim was not a compensable consequence of September 24, 2010 injury, making this issue moot.

However, in the opinion of the Arbitrator, if the Arbitrator had found that the continuous trauma claim was a compensable consequence of September 24, 2010, the Arbitrator would have found the insurance policy issued by Liberty Mutual to PIPS would have covered the injuries and benefits pursuant to the terms of the insurance policy.

5.     The Arbitrator finds regarding the issue if the claim for a continuous trauma injury from August 2005 through October 14, 2011 was found to be compensable consequence of the specific injury of September 24, 2010, did PIPS release the claim by way of settlement, the Arbitrator does not decide this issue as the Arbitrator found that the continuous trauma claim was not a compensable consequence of September 24, 2010 injury, making this issue moot.

However, the Arbitrator, after reviewing the settlement agreement, is of the opinion that the stipulation the parties entered  pursuant to the terms of the insurance policy issued by Liberty Mutual to PIPS, that a continuous trauma injury is only covered by the insurance policy if the employee's last date of last exposure to those conditions causing or aggravating such bodily injury by disease occurs during the policy period is the only issue PIPS released by way of the settlement agreement between PIPS and Liberty Mutual.

6.     The Arbitrator finds that PIPS is not entitled to prejudgment interest pursuant to Civil Code Section 3287.

7.     As to the issue of the Stipulations with Request for Award entered into between PIPS and the applicant, C███ E███, being inconsistent with PIPS's position that the specific injury of October 14, 2011, and the continuous trauma injury from August 2005 through October 14, 2011, are compensable consequences of the specific injury of September 10, 2010, the Arbitrator finds this issue is moot based on the findings above.

-2-

1    However, the Arbitrator is of the opinion that PIPS is bound by their Stipulations and

2  Awards in the underlying workers' compensation case.

3

4  DATED:  July 26, 2023                    ALTMAN, BLITSTEIN & BLINDER

5

6                                              By: _Mark L Kahn_____

7                                                   MARK L. KAHN,
                                                   ARBITRATOR
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

MARK L. KAHN, ARBITRATOR
ALTMAN, BLITSTEIN & BLINDER
A Professional Corporation
16255 Ventura Boulevard, Suite 1110
Encino, CA 91436-2319
(818) 995-0080

**PROTECTED INSURANCE PROGRAM FOR SCHOOLS & COMMUNITY COLLEGES JOINT POWERS AUTHORITY,**

**CLAIMANT,**

VS.

**LIBERTY INSURANCE CORPORATION,**

**RESPONDENT**.

**ARBITRATOR'S OPINION ON DECISION**

The above-captioned matter having been set for Arbitration on January 17, 2023, before Mark L. Kahn, Arbitrator, the parties having reached Stipulations, Issues and admitted Exhibits into evidence and have agreed to submit the matter on the present record,

**APPEARANCES:**

Haverkamp Law Firm, A Professional Corporation by Albert Haverkamp, Esq. for Protected Insurance Program for Schools & Community Colleges Joint Powers Authority ("PIPS").

Clyde & Co US LLP by Yvonne Schulte, Esq. for Liberty Insurance Corporation ("Liberty").

**STIPULATIONS**

1.    PIPS is a statutory joint powers authority which provides and administers a self-insurance program for workers' compensation claims involving its members, California school districts and other educational organizations, each of which self-insured pursuant to Labor Code §3700(c).

/ / /

-1-

2.     Liberty issued to The Protected Insurance Program (PIPS) and its members, an Excess Insurance Policy for Self-Insurer of Workers' Compensation Employer's Liability, policy number EW7-64N-441320 -010, effective from July 1, 2010 through July 1, 2011.

3.     The Liberty policy provides that Liberty will reimburse members "for loss as a qualified self-insured under the workers' compensation law," in excess of a $100,000 retention, subject to a $900,000 limit and its other terms, conditions, limitations and exclusions. In order for there to be coverage for "bodily injury by disease" causing cumulative injury, the employee's last day of last exposure to those conditions causing or aggravating such bodily injury by disease must occur during the policy.

4.     Pursuant to the terms of the policy issued by Liberty to PIPS, bodily injury by accident is covered only if bodily injury by accident occurs during the policy period according to the terms of the policy issued by Liberty.

5.     C████ █████ suffered a specific injury on September 24, 2010, a specific injury on October 14, 2011, and a continuous trauma claim from August 2005 through October 14, 2011. The claim for the specific injury on September 24, 2010 is covered by the insurance policy issued by Liberty, subject to the terms, conditions, and limitations of the policy. The injury of October 14, 2011, and the continuous trauma injury, fall outside the period of coverage for the insurance policy issued by Liberty.

6.     Applicant and PIPS entered into Stipulations with Request for Award for a specific injury on September 24, 2010 to applicant's right shoulder and psyche (case █████████) a specific injury on October 14, 2011 to applicant's left shoulder and psych (case █████████) and a cumulative trauma injury from August 2005 through October 14, 2011 to applicant's bilateral wrists, bilateral hands, psyche, back, and neck (case █████████).

7.     Liberty is liable to reimburse PIPS for covered loss in connection with the specific injury of September 24, 2010, subject to the other terms, conditions, and limitations of the policy, and in excess of a $100,000 retention, regardless of when benefits are payable, even if the benefits are payable after the policy if the employees last date period contained in the insurance policy issued to PIPS by Liberty.

-2-

8.     The parties stipulate that pursuant to the terms of the insurance policy issued by Liberty to PIPS, a continuous trauma injury is only covered by the insurance policy if the employee's last date of last exposure to those conditions causing or aggravating such bodily injury by disease occurs during the policy period.

9.     The parties stipulate that PIPS and Liberty entered into a settlement agreement dated April 1, 2019, wherein PIPS released "any and all cumulative injury claims ('CT Claims') wherein the claimant's last day of last exposure ('LDLE') to those conditions causing or aggravating the cumulative injury occurred after the expiration date of the Liberty Policy, July 1, 2011."

**ISSUES**

1.     Is the claim for the continuous trauma injury from August 2005 through October 14, 2011, a compensable consequence of the specific injury of September 24, 2010, or a separate and distinct injury?

2.     Is the claim for the specific injury of October 14, 2011 a compensable consequence of the specific injury of September 24, 2010 or a separate and distinct injury?

3.     If the claim for a continuous trauma injury from August 2005 through October 14, 2011 is found to be a compensable consequence of the specific injury of September 24, 2010, are the injuries and benefits covered by the terms of the insurance policy issued by Liberty to PIPS?

4.     If the claim for a continuous trauma injury from August 2005 through October 14, 2011 is found to be compensable consequence of the specific injury of September 24, 2010, did PIPS release the claim by way of settlement?

5.     If the claim for the specific injury of October 14, 2011 is found to be a compensable consequence of the specific injury of September 24, 2010, are the injuries and benefits covered by the terms of the insurance policy issued by Liberty to PIPS?

6.     Is PIPS entitled to prejudgment interest pursuant to Civil Code Section 3287?

7.     Is the Stipulations with Request for Award entered into between PIPS and the applicant, C████ E███, inconsistent with PIPS's position that the specific injury of October

/ / /

-3-

14, 2011, and the continuous trauma injury from August 2005 through October 14, 2011, are
compensable consequences of the specific injury of September 24, 2010?

**EXHIBITS OF LIBERTY**

    A.    Liberty Policy Number EW7-64N-441320-010 (July 1, 2010 through July 1, 2011).

    B.    Executed settlement agreement between Liberty and PIPS dated April 1, 2019.

    C.    Medical report of Mark Ganjianpour, M.D. dated October 20, 2011.

    D.    Medical report of Mark Ganjianpour, M.D. dated November 16, 2011.

    E.    Portion of transcript of C▮▮▮▮ E▮▮▮ dated August 14, 2012.

    F.    Stipulations with Request for Award dated September 16, 2019.

    G.    Medical reports of David Kauss, Ph.D. dated May 3, 2012, December 22, 2014,
March 25, 2015 and September 3, 2015.

**EXHIBITS OF FOR PROTECTED INSURANCE PROGRAM FOR SCHOOLS & COMMUNITY COLLEGES JOINT POWERS AUTHORITY**

    1.    Deposition transcript of Steven Silbart, M.D. taken April 26, 2021.

    2.    Medical report of Steven Silbart, M.D. dated May 25, 2018.

    3.    Medical report of Stephen Silbart, M.D. dated May 14, 2018.

    4.    Stipulations with Request for Award dated September 16, 2019.

    5.    Medical report of Mark Ganjianpour, M.D. dated October 20, 2011.

    6.    Medical report of Mark Ganjianpour, M.D. dated August 10, 2011.

    7.    Medical report of David Friedman, M.D. dated September 24, 20018.

    8.    Medical report David Friedman, M.D. dated February 6, 2018.

    9.    Payment List for Claim 439637 (September 24, 2010, specific injury)

    10.    Payment Claim 533389 (October 14, 2011, specific injury

    11.    Payment Listing for claim 533388 (continuous trauma injury through October 14, 2011).

    12.    Payment listing for claim 457873 (initial claim number for the October 14, 2011, specific injury. (All payments for claim number 457873 have been transferred to 439637, 533389 and 533388).

-4-

13.    Summary of the list of Payments prior to October 14, 2011, on claim 439637.

## ARGUMENT OF PROTECTED INSURANCE PROGRAM FOR SCHOOLS & COMMUNITY COLLEGES JOINT POWERS AUTHORITY

1.    The best medical evidence on the issue of apportionment between the three inter-related industrial injuries, the specific injury of September 24, 2010, the specific injury of October 14, 2011, and the continuous trauma injury from August 2005 through October 14, 2011 is the medical reports and deposition testimony of Dr. Silbart.

2.    Dr. Silbart found continuous trauma injury from August 2005 through October 14, 2011 was partially a compensable consequence of the September 24, 2010 injury and was partially a separate and distinct injury and the October 14, 2011 specific injury was also a partially compensable consequence of the September 24, 2010 injury and partially a separate and distinct injury.

3.    On September 24, 2010, the applicant sustained a specific injury to his right shoulder and cervical spine. Dr. Ganjianpour reported the applicant had subjective complaints of pain in the neck which radiated from the right shoulder, frequent headaches which he associated with neck pain and stiffness and pain in the neck. He diagnosed the applicant with the cervical spine strain/sprain will allow possible disc herniation, right shoulder rotator cuff tear, tension headaches most likely related to the neck and right shoulder, inability to sleep due to the pain.

4.    The applicant had right shoulder surgery on January 11, 2011.

5.    The applicant returned to work on May 24, 2011.

6.    From May 2011 through October 14, 2011, the applicant was working favoring his right shoulder, therefore, using his left shoulder more than usual. During this time frame, the applicant was regularly exceeding his work restrictions.

7.    On October 14, 2011, the applicant sustained an injury to the left shoulder, cervical spine, lumbar spine and wrists.

8.    The applicant had left shoulder surgery on February 25, 2014.

9.    Dr. Silbart in his report of May 25, 2018 apportions the right shoulder to the September 24, 2010 specific injury, left shoulder, bilateral wrist and lumbar spine to both the

-5-

October 14, 2011 specific injury and the continuous trauma, the cervical spine only to the continuous trauma injury.

10.    Dr. Silbart in his report of May 25, 2018, apportions the right shoulder only to September 24, 2010 specific injury, the left shoulder to the October 14, 2011 specific injury, and the cervical cervical spine, lumbar spine, bilateral wrists the continuous trauma injury.

11.    The medical reports of Dr. Silbart did not take into account the applicant was favoring his right shoulder causing him to overuse his left shoulder prior to and on October 14, 2011. It does not make sense to apportion the cervical spine injury only to the October 14, 2011 continuous trauma injury when the cervical spine was significantly injured in the September 24, 2010 specific injury. Reports do not have an analysis of the combined impact/effect which applicant's overuse the left arm, avoidance of the cervical pain, and exceeding work restrictions had on the development of the lumbar spine and bilateral wrist pain. In order to clarify these apportionment issues with Dr. Silbart, PIPS took the physician's deposition on April 26, 2021.

12.    Dr. Silbart in his deposition testimony as to apportionment found left shoulder 66% attributed to the September 24, 2010 specific injury and 33.4% to the specific injury of October 14, 2011. As to the wrists, 33.4% was attributed to the September 24, 2010 specific injury is a compensable consequence and 66.6 % to the October 14, 2011continuous trauma injury. As to the lumbar spine, 66.6% attributed to a compensable consequence of the September 24, 2010 injury and 33.4% to the October 14, 2011 continuous trauma injury. Although Dr. Silbart was not specifically asked about apportionment of the cervical spine, his testimony indicates apportionment would be the same as for the lumbar spine.

13.    Dr. Ganjianpour, in his report of November 16, 2011, finds the left shoulder, bilateral hands and lumbar spine are related to the October 14, 2011 injury. The physician noted the applicant did have another injury prior to this to the right shoulder and the cervical spine. The new injury did not involve previous body parts. Therefore, there is no apportionment to the previously injured body parts with regard to the current injury.

/ / /

/ / /

-6-

14.    Dr. Roberts apportioned the neck to the specific injury of September 24, 2010, the injury to both shoulders on September 24, 2010, the lumbar spine was apportioned to the specific injury of October 14, 2011.

15.    Dr. Silbart opinions on apportionment should be given the greatest weight because he was chosen by the parties to act as Agreed Medical Evaluator and he was the only physician to consider the evidence of favoring the right shoulder, overuse of the left shoulder and of exceeding work restrictions in coming to his apportionment conclusions.

16.    As to the psychiatric portion of the claim, the applicant sought no psychiatric treatment between September 24, 2010 and October 14, 2011. The applicant told Dr. Kauss he was depressed and anxious in that timeframe due to the chronic pain and physical limitations.

17.    Consensus of the applicant's psychiatrist was that his psychiatric disability was 100% attributable to the orthopedic injuries he sustained on September 24, 2010 and October 14, 2011. As to apportionment between the injuries, Dr. Kauss and Dr. Friedman found the injuries too intertwined to separate. Dr. Scheinbaum believed psychiatric apportionment amongst the industrial injury should follow the orthopedic apportionment. None of these doctors had an opportunity to review Dr. Silbart's deposition testimony on apportionment between the three interrelated industrial injuries. PIPS suggest the psychiatric component should follow Dr. Silbart's final apportionment amongst the three interrelated industrial injuries.

18.    Dr. Silbart's deposition testimony establishes that both the October 14, 2011 specific and the continuous trauma injury from August 2005 through October 24, 2011 are partially compensable consequences of the September 24, 2010 specific injury and partially separate and distinct injuries. To that extent, they are deemed separate and distinct injuries and there is no coverage under the Liberty policy. To the extent they are deemed compensable consequences of the September 24, 2010 specific injury, they are covered.

19.    In his deposition, Dr. Silbart provides an apportionment among the three interrelated industrial injuries. This is exactly the type of apportionment analysis which is required to determine reimbursement under an excess workers' compensation policy.

/ / /

-7-

20.     Liberty appears to agree with the premise that there needs to be an apportionment amongst inter-related industrial injuries in order to determine whether and to what extent reimbursement is owed by an insurer.  What bothers Liberty is Dr. Silbart's use of the compensable consequence concept as the basis for his apportionment.  Liberty's objections to the compensable consequence concept are unfounded and Dr. Silbart's 2021 deposition testimony should be viewed as straightforward apportionment between the three inter-related industrial injuries.

21.     A compensable consequence involves a causal nexus between a primary industrial injury and a new and distinct injury such as the subsequent injury is a direct result of the compensable primary injury.  If so, the secondary incident is not considered a new and independent injury and relates back to the original injury.

22.     The Liberty policy covers compensable consequences.   The policy states as follows: "We will indemnify you for loss as a qualified insurer under the workers' compensation law" Endorsement # 10 to the policy provides, "Loss means amount you have actually paid as a self-insurer under the workers' compensation law plus any expenses....".  If, pursuant to a Liberty covered industrial injury, PIPS has to pay compensable consequence benefits attributed to the covered primary industrial injury, those benefits would fall under the above-referenced definition of "loss" and would be reimbursable.

23.     Liberty contends compensable consequences are a workers' compensation concepts that do not apply to the policy.  According to Liberty, this somehow results in compensable consequence benefits not being reimbursable.  This contention misses the point and misconstrues the policy.  While workers' compensation concepts do not apply directly to the policy to dictate coverage, workers' compensation concepts apply to PIPS. The application of California workers' compensation law concepts to PIPS is what establishes the amount of benefits PIPS has to pay, which also establishes the amount of PIPS's loss for purposes of reimbursement.  Thus, PIPS payment of workers' compensation benefits associated with a compensable consequence injury attributed to a Liberty covered primary industrial injury is a reimbursable loss under the policy.

/ / /

/ / /

-8-

24.    Liberty sites to the case for the propositions court should not impose an obligation on insurer that contravenes a provision in its insurance policy. Here, PIPS only seeks to enforce an obligation to reimburse the applicant for benefits which are explicitly reimbursable under the policy. There is no part of the policy which contravenes the obligation reimburse.

25.    To the extent the injuries left shoulder, cervical spine, lumbar spine and wrists are deemed compensable consequences of the September 24, 2010 specific injury, the benefits paid by PIPS for those body parts constitute reimbursable "loss" associated with the covered September 24, 2010 specific injury. To the extent the injuries to the left shoulder, cervical spine, lumbar spine and wrists are deemed separate and distinct workers' compensation injuries, the benefits paid by PIPS for those body parts cannot be reimbursable.

26.    Regarding the issue of whether the continuous trauma is found to be a compensable consequence of the specific injury of September 24, 2010 and if so did PIPS release this claim by way of settlement with Liberty in 2019, the facts show that Liberty and PIPS settled the lawsuit on April 1, 2019. The settlement included an agreement by PIPS to not seek reimbursement from Liberty from any other continuous trauma claims where the last date of last exposure was outside the Liberty policy. The scope of the release in his settlement agreement has no impact on PIPS's claims in this Arbitration. PIPS admits there is no coverage for the August 2005 through October 14, 2011 continuous trauma claims and PIPS is not seeking coverage from Liberty for this continuous trauma based on Labor Code §5500.5. PIPS is only entitled to reimbursement from Liberty to the extent the latter sustained injuries are found to be apportionment to the September 24, 2010 specific injury is a compensable consequence.

27.    As to the issue is PIPS entitled to prejudgment interest pursuant to Civil Code Section 3287, they indicate the primary purpose of that section is to provide just compensation to the injured party for loss of use of the underlying award during the prejudgment. In other words, to make the plaintiff whole as of the date of injury. Courts generally apply a liberal construction in determining whether a claim is certain or liquidated. The test for determining certainty is whether the defendant knew the amounts of damages owed to the claimant could have computed the amount from reasonable available information. Uncertainty as to liability is irrelevant, as the

-9-

dispute concerning liability does not preclude prejudgment interest in a civil action. The certainty required by Section 3287(a) is not lost when the existence of liability turns on disputed facts, but only when the amount of damages turns undisputed facts.

28.    Liberty contends PIPS is not entitled to prejudgment interest because the amount PIPS is seeking is disputed. However, PIPS submitted information to Liberty from which Liberty could have calculated the reimbursement owed. In insurance coverage cases, courts have applied an even greater liberal construction in determining whether a claim is certain for purposes of prejudgment interest.

29.    If there is an ambiguity in the construction of the California statute, PIPS believes the Supreme Court in California would be persuaded that, particularly insurance cases, when all the information has been submitted from which the loss may be calculated, the insured should not be deprived of the use of the amount determined to be due because of a dispute or the meaning of a policy term. Moreover, the insurance company should not occur any loss by being required to pay prejudgment interest from the date it was furnished with appropriate data, because it has had the use of the money while the dispute over the policy terms have been litigated.

30.    In this case, PIPS provided Liberty detailed payment listings of each claim which itemized every benefit and claim expense paid on each claim. Liberty does not dispute these amounts. Liberty disputes liability, that any further reimbursement is owed based on two primary assertions: the October 14, 2011 specific and the October 14, 2011 continuous trauma are not compensable consequences of the September 24, 2010 specific injury and even if they are compensable consequences there is no coverage under the policy. Liberty could have reasonably calculated to reimbursement owed if it had acknowledged the specific and the continuous trauma, in part, for compensable consequences of the September 24, 2010 specific injury. Liberty has chosen to rely on its no liability arguments is the basis to withhold reimbursement. It is not fair for Liberty to have the benefit of reimbursement amounts owed since 2016 if Liberty's liability position does not prevail.

31.    As to the issue whether the Stipulations with Request for Award entered into between PIPS and the applicant is inconsistent with PIPS's position that the specific injury of

October 14, 2011 and the continuous trauma injury from August 2005 through August 14, 2011 are compensable consequence is a specific injury September 14, 2010. The issue of whether the October 14, 2011 specific injury and the August 2005 through August 14, 2011 continuous trauma are partially compensable consequences of the September 24, 2010 specific injury turns on medical evidence. The Stipulations are not medical evidence, they merely reflect the negotiations of counsel concerning resolution of the permanent disability rating, life pension and identifying the body parts for which future medical care will be provided. The Stipulations parsing of the body parts amongst the three interrelated injuries is just a reflection of the machinations of counsel to achieve these resolutions. Since these are not medical records, Stipulations are largely immaterial to the issue of whether the October 14, 2011 specific injury and the August 2005 through August 14, 2011 continuous trauma are partially compensable consequences of the September 24, 2010 specific injury.

32. The Stipulations indicate the cervical spine was not injured on September 24, 2010. This is incorrect. Second Stipulations ignore the evidence of the right shoulder favoring left shoulder overuse. Third Stipulations do not account for the evidence of exceeding work restrictions. Fourth, the Stipulations incorrectly state that Dr. Silbart found the three injuries were inextricably intertwined, and asked the doctor did not do so. Finally, the Stipulations were entered into before the deposition of Dr. Silbart concerning compensable consequence and apportionment. Simply stated, the Stipulations are not medical and are inconsistent with the actual medical evidence.

33. It should also be noted that the issue of compensable consequence/apportionment amongst three injuries for purposes of coverage under Liberty's excess policy was not an issue in the workers' compensation proceedings. A WCAB preceding does not have jurisdiction to adjudicate coverage issues involving an excess workers' compensation policy in case law shows the WCAB Stipulations settlements are inconsequential with respect to coverage disputes between self-insured employers and its excess insurer.

/ / /

/ / /

-11-

34.    The Stipulations are not medical evidence and are immaterial with respect to the issue of whether the injuries the left shoulder, cervical spine and wrists are properly apportioned in part to the September 24, 2010 specific injury as a compensable consequence.

**ARGUMENT OF LIBERTY**

1.    The Protected Insurance Program ("PIPS") is a statutory joint power authority which provides and administers a self-insurance program for workers' compensation claims involving its members, California school districts and other educational organizations, each of which is self-insured pursuant to California Labor Code §3700(c).

2.    PIPS initially sued Liberty on June 4, 2018 over to claims not at issue here. PIPS and Liberty settled and executed a settlement agreement in 2019. In that agreement, PIPS released "any and all cumulative injury claims ('CT Claims') where in the claimant's last day of last exposure to those conditions causing or aggravating the cumulative injury occurred after the expiration date of Liberty's policy, July 1, 2011.

3.    The policy is not a workers' compensation policy. Labor Code §5500 does not control the policy or the 2019 Agreement, and the Workers' Compensation Appeals Board does not have jurisdiction over the issues in this case. Labor Code §5500 is limited disputes involving workers' compensation benefits to an employee. An excess workers' compensation policy reimburses employers and pays no benefits to employees, is not a workers' compensation policy, is not subject to the Labor Code.

4.    The insurance policy issued by Liberty provides that it will reimburse PIPS for loss as a qualified self-insurer under the workers' compensation law, in excess $100,000 retention, subject to a $900,000 limit and its other terms, conditions, limitations and exclusions. Subject to its terms and conditions, the policy covers loss arising from bodily injury by accident or bodily injury by disease. For bodily injury by disease causing cumulative injury, the employees to those conditions causing or aggravating such bodily injury by disease must occur during the policy. In order for there to be coverage under the policy, bodily injury by accident is covered only bodily injury by accident occurs during the policy.

/ / /

-12-

5.      PIPS now seeks coverage for three workers' compensation claims asserted by C███████ E████. C███████ E████ suffered a specific injury on September 24, 2010, another injury on October 14, 2011, and a continuous trauma claim from August 2005 through August 14, 2011.

6.      PIPS concedes there is no coverage for the 2011 claim for the continuous trauma claim under the policy. Furthermore, PIPS released E█████ continuous trauma claim waive any and all cumulative injury claims wherein the claimant's (LDLE) to those conditions causing or aggravated occurred after the expiration date of Liberty's policy.

7.      According to PIPS, 70% of E█████ treatment/benefits after October 14, 2011 are attributed to the September 24, 2010 injury. PIPS claims that such treatment is attributable to the 2011 claim because it was a compensable consequence under California workers' compensation law. The 2011 and continuous trauma claims are not compensable consequence in the 2010 claim. The continuous trauma claim began years before the 2010 claim, in August 2005. In 2011, E█████ was injured when he was lifting heavy bags outside of his restrictions. In doing so, E█████ suffered a separate, discrete injury performing work duties after the termination of the policy.

8.      However, even if the 2011 and the continuous trauma claims are compensable consequences under workers' compensation law, they are not covered under the policy pursuant to California law. The insurance policy issued by Liberty provides that they must reimburse PIPS only for claim expenditures caused by an injury that the policy covers. PIPS argues compensable consequence is under California workers' compensation law requires coverage, but this concept does not apply here.

9.      The insurance policy only covers injury by accident occurring during the policy period. The 2011 claim occurred on October 14, 2011. The policy terminated on July 1, 2011. There is no coverage for any treatment for the 2011 claim.

10.     The policy applies only to bodily injury by disease, including cumulative trauma, when the LDLE occurred during the policy. The last day of the continuous trauma claim was October 14, 2011, so there is no coverage for any of the treatment for the continuous trauma claim.

/ / /

11.     Labor Code §5500 does not apply to the policy.  The policy language controls. Section 5500.5 does not apply to the instant case because an express policy is not a workers' compensation policy and thus, cannot be subject to Division Four of the Labor Code, the part of the Labor Code in which section 5500.5 appears.  PIPS released ██████s claim in the 2019 Agreement.

12.     PIPS argues apportionment based on the workers' compensation theory of compensable consequence, arguing that all (100%) of the treatment for ██████s right shoulder is attributable to the 2011 claim.  PIPS asserts that two-thirds of the treatment for the left shoulder is attributable to the 2010 claim because it is a compensable consequence.  The 2011 claim is not a compensable consequence of the 2010 claim under workers' compensation law because it arises out of arduous duties from reassignment to grounds in excess of his restrictions.  But even if it were, the policy covers not of the treatment for the 2011 claim because the bodily injury did not occur during the policy period.  The bodily injury giving rise to the 2011 claim occurred after the policy expired and no coverage treatment for the claim exists.

13.     PIPS argues that 1/3 of ██████s treatment for the wrists and 2/3 of the treatment for his spine should be attributed to the 2010 claim because they are a compensable consequence to the 2010 claim.  None of the medical treatment for the continuous trauma claim is covered under the policy because it only covers claims or cumulative trauma when the employees LDLE occurs during the policy.  Here, PIPS concedes that the LDLE occurred after the Liberty policy expired.  Again, PIPS expressly released all such continuous trauma claims in the 2019 Agreement.

14.     Liberty notes that although it is not bound by the Stipulations in this matter, PIPS's physician contradicts the WCAB Stipulations, which dismissed all body parts of the right shoulder 2010 claim.  Despite the Stipulations entered, PIPS now tries to assert after, develop theories to improperly allocate treatment for other injuries to the 2010 claim.  However, the policy does not afford coverage 2011 continuous trauma claim.

15.     PIPS also argues that the psychiatric allocation should follow this 70% apportionment and request a global orthopedic apportionment of 70% to the 2010 claim.  This is wrong because PIPS attempts to assign apportionment to Liberty's two uncovered claims, the 2011

-14-

and continuous trauma claim. Pursuant to the terms of the Liberty policy, well-established California law, and the release provided by PIPS for amounts incurred for treatment of the 2011 claim, they are in excess of PIPS $100,000 SIR. Moreover, psychiatric allocation is wrong because it did not occur until after termination of the policy. Records demonstrate the psychiatric component occurred as a result of the compound nature of all injuries, which occurred as a result of the failure to work within restrictions, as well as E████ stress because his employer would not respect his restrictions, and because he was eliminated from his employment. Thus, none of the psychiatric treatment should be allocated to the 2010 claim.

16.     As confirmed in PIPS's brief, Liberty has reimbursed PIPS $54,881.89 in excess of the $100,000 SIR for the 2010 claim. To recover more, PIPS must show that all loss for the 2010 claim, right shoulder, exceeds $154,881.89. It has not and cannot do so. In fact, Liberty believes it may have paid in excess amounts owed.

17.     PIPS has not demonstrated that it is owed additional amounts. It failed to demonstrate that Liberty breached the terms of the policy.

18.     PIPS is also not entitled prejudgment interest. Civ.C. §3287 provides: Every person who is entitled to recover damages certain, or capable of being made certain by calculation, right to recover which is vested in him upon a particular day is entitled also to recover interest thereon from that day. Under Civ.C. § 3287, damages are deemed certain when, through the parties' disputed liability, the essentially do not dispute the commutation of damages, if any. An award of prejudgment interest is improper where facts essential to coverage are in dispute. But where the only dispute is a legal one, an award prejudgment interest is proper.

19.     When benefits due under the policy are unliquidated, the insured has no right to prejudgment interest until the amount of loss is settled or determined. Interest traditionally has been denied on unliquidated claims because of the general equitable principle that a person who does not know what sum is owed cannot be in default for will failure pay. The amount PIPS seeks is in dispute as Liberty contends it currently owes, nothing further.

/ / /

/ / /

-15-

20.     Finally, PIPS is not entitled to declaratory relief that Liberty has an obligation to pay 70% of all future claim expenditures, as Liberty has an obligation to pay future claim expenditures, if any, for the 2010 claim.

**FACTS**

1.     Liberty issued to The Protected Insurance Program (PIPS) and its members, an Excess Insurance Policy for Self-Insurer of Workers' Compensation Employer's Liability, policy number EW7-64N-441320 -010, effective from July 1, 2010 through July 1, 2011.

2.     The Protected Insurance Program (PIPS) is a statutory joint powers authority which provides and administers a self-insurance program for workers' compensation claims involving its members, California school districts and other educational organizations, each of which self-insured pursuant to Labor Code §3700(c).

3.     C█████ E█ suffered a specific injury on September 24, 2010.  Dr. Mark Ganjianpour in his report of August 10, 2011, reports that the applicant on September 24, 2010, while performing his customary duties as a maintenance man and as he was going over a fence, experienced a popping sensation in his right shoulder.  He had immediate pain and feeling of dislocation.  The applicant had surgery on January 11, 2011.  The physician's impression was that the applicant was status post right shoulder rotator cuff repair, as well as distal clavicle resection, January 2011, cervical spine sprain/strain and inability to sleep, resolved after the shoulder condition had improved.  Based on the available information, the physician concluded that the current symptoms for the right shoulder were caused by the injury he sustained on September 24, 2010.  The apportionment was 100% disability to that injury.  The applicant was given a work restriction of maximum lifting up to 15 pounds at no work at or above shoulder level on the right side.

4.     C█████ E████ suffered a specific injury on October 14, 2011.  The applicant testified in his deposition that on October 14, 2011, he was working on a football field and was filling up bags with rubber and was putting the bags on the electric card and was taking them out to dump them in a larger container.  Because he was shoveling a lot, putting that rubber into the bags and bags in the cart, he felt an injury to his shoulder.  He felt pain in his shoulder, while

-16-

shoveling and lifting the bags, in his left shoulder and both wrists. Dr. Mark Ganjianpour in his
report of November 16, 2011, reported the applicant sustained an injury on October 14, 2011,
while employed as a maintenance man. The applicant stated he sustained injuries on October 14,
2011, while in the process of removing artificial turf from the playing field on campus. He was
placing the artificial turf into rubber trash bags that were provided to him and then placed the bags
on the back of an electrical cart to be transported to a trash bin. As the applicant lifted one of the
bags, he felt a sharp pain in his left shoulder, left elbow, both wrists and lower back. He relates
he had only performed this task for about an hour or so when he experienced the pain. The
applicant reported the injury to his employer. The applicant went for medical attention. The
applicant reported complaints to the left shoulder, left wrist, right risk, lower back and psyche.
The physician concluded that based on the applicant's history and the physical exam and x-rays,
he believed the applicant's current complaints to the left shoulder, bilateral hands and lumbar spine
were related to the October 14, 2011 injury. The physician indicated that it should be noted the
applicant did have another injury prior to the right shoulder and cervical spine. The new injury
did not involve the previous body parts. Therefore, there is no apportionment to previously injured
body parts with regard to the current injury. It should be noted that the applicant is complaining
of anxiety and depression. The primary treating physician recommended the applicant see a
psychiatrist or psychologist to determine whether the injury was related to work.

5.    C█████E███a suffered a continuous trauma from August 2005 through October
14, 2011. Dr. Mark Ganjianpour in his report of October 20, 2011, reports that the applicant comes
in regarding flareup of his injuries. The applicant states to compensate for his right shoulder, he
has been using his left shoulder more than usual, which has caused pain in his left shoulder. The
physician explained to the applicant that the lumbar spine, the left shoulder and wrists are not
under the claim at this time. Therefore, he was unable to treat the applicant. Dr. Steven Silbart in
his report of May 14, 2018, finds continuous trauma injury while the applicant was working at
Beverly Hills Unified School District beginning in August 2005. The applicant states that around
September 24, 2010, he sustained an injury. The applicant was trying to go on top of the fence, he
pulled himself up, holding on to the bleachers, at which time, he felt pain in his right shoulder.

-17-

The applicant states that on October 14, 2011, he was shoveling fragments of turf from the field and loading them into a utility cart when he started to notice discomfort in his left shoulder, wrist hands and low back. The applicant was present with symptoms to the cervical spine, right shoulder, left shoulder, wrists, hands, lumbar sacral spine and cervical spine. The physician indicated he was evaluating the applicant for a specific injury on September 24, 2010, October 14, 2011, as well as a continuous trauma injury. The physician finds an industrial injury to the neck, low back, and both wrists as a result of the continuous trauma injury. Dr. Steven Silbart in his report of May 25, 2018, finds as to the cervical and lumbar disability, he apportioned 85% to continuous trauma injury. He did not find apportionable lumbar disability relative to the October 14, 2011 specific injury. With respect to the wrist, 70% is apportioned to the continuous trauma injury. With respect to the right shoulder disability is all apportioned to the September 24, 2010 specific injury and the left shoulder is apportioned entirely to the October 14, 2011 specific injury.

6. As to the psychiatric portion of the case, the applicant was evaluated by David L. Friedman, M.D. Dr. Friedman as to causation found the emotional impact of the industrial orthopedic injuries was the predominant cause of applicant's injury and major depression. As to apportionment, the physician found 100% of the psychiatric impairment was attributable to industrial sources. The physician for the emotional impact of the industrial orthopedic injuries of September 24, 2010 and October 14, 2011 was predominant among all causes combined and causation of the injury. The physician apportioned 30% to the lasting emotional effect of decrease in hours, and other alleged retaliatory behaviors on the part of the employer early in 2013 and the June 2013 layoff; compensability deferred to the trier-of-fact. The remaining 70% of the permanent psychiatric impairment is due to the impact of the orthopedic injuries and impairment. As to *Benson*, the physician found two specific injuries and the continuous trauma injury, the physician found the exception to *Benson* applies (disability cannot be parceled out between the three injuries), therefore, 100% of the permanent psychiatric disability is due to the emotional impact the orthopedic injuries and disability and is attributable to the combined effects of all three dates of injury. David R. Kauss, Ph.D. found the applicant's psychiatric condition was caused by the orthopedic injuries and all three entries were intertwined and could not be separated out.

-18-

7. Applicant and PIPS entered into a joint Stipulations with Request for Award cases ███████, ███████, and ████████ for 82% permanent disability which were approved by the Appeals Board on September 16, 2019. Case number ████████ was Stipulations and Request for Award for a specific injury on September 24, 2010 to applicant's right shoulder and psyche. Case number ████████ was Stipulations with Request for Award for a specific injury on October 14, 2011 to applicant's left shoulder and psyche. Case number ████████ Stipulations with request for Award for a cumulative trauma injury from August 2005 through October 14, 2011 to applicant's bilateral wrists, bilateral hands, psyche, back and neck.

8. Liberty issued to The Protected Insurance Program (PIPS) and its members, an Excess Insurance Policy for Self-Insurer of Workers Compensation Employer's Liability, policy number EW7-64N-441320 -010, effective from July 1, 2010 through July 1, 2011.

9. The Liberty policy provides that Liberty will reimburse members "for loss as a qualified self-insured under the workers' compensation law," in excess of a $100,000 retention, subject to a $900,000 limit and its other terms, conditions, limitations and exclusions. In order for there to be coverage for "bodily injury by disease" causing cumulative injury, the employee's last day of last exposure to those conditions causing or aggravating such bodily injury by disease must occur during the policy.

10. Pursuant to the terms of the policy issued by Liberty to PIPS, bodily injury by accident is covered only if bodily injury by accident occurs during the policy period according to the terms of the policy issued by Liberty.

11. The claim for the specific injury on September 24, 2010 is covered by the insurance policy issued by Liberty, subject to the terms, conditions, and limitations of the policy. The injury of October 14, 2011, and the continuous trauma injury, fall outside the period of coverage for the insurance policy issued by Liberty.

12. The parties stipulate that pursuant to the terms of the insurance policy issued by Liberty to PIPS, a continuous trauma injury is only covered by the insurance policy if the

///

-19-

employee's last date of last exposure to those conditions causing or aggravating such bodily injury by disease occurs during the policy period.

13.    The parties stipulate that PIPS and Liberty entered into a settlement agreement dated April 1, 2019, wherein PIPS released "any and all cumulative injury claims ('CT Claims') wherein the claimant's last day of last exposure ('LDLE') to those conditions causing or aggravating the cumulative injury occurred after the expiration date of the Liberty Policy, July 1, 2011."

14.    The parties stipulated that Liberty is liable to reimburse PIPS for covered loss in connection with the specific injury of September 24, 2010, subject to the other terms, conditions, and limitations of the policy, and in excess of a $100,000 retention, regardless of when benefits are payable, even if the benefits are payable after the policy if the employees last date period contained in the insurance policy issued to PIPS by Liberty.

## DISCUSSION OF ISSUES

### A.

**Is the claim for the specific injury of October 14, 2011 a compensable consequence of the specific injury of September 24, 2010 or a separate and distinct injury?**

The Arbitrator finds that applicant, C████ E████, suffered a specific injury on September 24, 2010.

The Arbitrator finds that applicant, C████ E████, suffered a specific injury on September 24, 2010, based on the applicant's history given to the various physicians and the opinion of Dr. Mark Ganjianpour, which is found to be the better reasoned and more persuasive and Dr. Mark Ganjianpour's report which was more contemporaneous in time as to the industrial injury as he saw the applicant in 2011.

As to history, Dr. Mark Ganjianpour in his report of August 10, 2011, reports that the applicant on September 24, 2010, was performing his customary duties as a maintenance man and as he was going over a fence, experienced a popping sensation in his right shoulder. He had immediate pain and feeling dislocation.

/ / /

Applicant had surgery on January 11, 2011 consisting of a right shoulder rotator cuff repair, as well as distal clavicle resection.

Dr. Mark Ganjianpour opined that based on the available information that applicant's current symptoms for the right shoulder were caused by the injuries he sustained on September 24, 2010. The apportionment was 100% disability to that injury.

The applicant was given a work restriction of maximum lifting up to 15 pounds at no work at or above shoulder level on the right side.

He further concluded that cervical spine sprain/strain and inability to sleep, resolved after the shoulder condition had improved.

Based on the above evidence, the Arbitrator finds the applicant sustained a specific injury on September 24, 2010 to the right shoulder and the complaints to the cervical spine sprain/strain and inability to sleep resolved.

The Arbitrator finds that applicant, C███ E███, suffered a second specific injury on October 14, 2011.

The Arbitrator finds that applicant, C███ E███, suffered a specific injury on October 14, 2011 based on the applicant's history given to the various physicians, his deposition testimony and the opinion of Dr. Ganjianpour, which is found to be the better reasoned and more persuasive and Dr. Ganjianpour's report was more contemporaneous in time as to the industrial injury as he saw the applicant in November 2011.

The applicant testified in his deposition that on October 14, 2011, he was working on a football field and was filling up bags with rubber and was putting the bags on the electric cart and was taking them out to dump them in a larger container.

Because he was shoveling in a lot, putting that rubber into the bags and bags in the cart, he felt injury to his shoulder. He felt pain in his shoulder, while shoveling and lifting the bags, to his left shoulder and both wrists.

Dr. Ganjianpour in his report of November 16, 2011, reported the applicant sustained an injury on October 14, 2011, while employed as a maintenance man. The applicant stated he sustained injuries on October 14, 2011 in the process of removing artificial turf from the playing

-21-

field on campus.  The applicant placed the artificial turf into rubber trash bags that were provided to him and then placed the rubber bags on the back of an electrical cart to be transported to a trash bin.  As the applicant lifted one of the bags, he felt a sharp pain in his left shoulder, left elbow, both wrists and lower back.  He relates he had only performed this task for about an hour when he experienced the pain.  The applicant reported the injury.  The applicant went for medical attention.

The applicant reported complaints to the left shoulder, left wrist, right risk, lower back and psyche.

The physician concluded that based on the applicant's history and the physical exam and x-rays, he believed the applicant's current complaints to the left shoulder, bilateral hands and lumbar spine were related to the October 14, 2011 injury.

The physician further indicated it should be noted the applicant did have another injury prior to the right shoulder and cervical spine.  The new injury did not involve the previous body parts.  Therefore, there is no apportionment to previously injured body parts with regard to the current injury.

Dr. Ganjianpour in his report of November 16, 2011, stated that it should be noted that the applicant is complaining of anxiety and depression.

The primary treating physician recommended the applicant see a psychiatrist or psychologist to determine whether the injury was related to work.

Based on the above evidence, the Arbitrator finds the applicant sustained a specific injury on October 14, 2011, to the left shoulder, bilateral hands and lumbar spine and the new injury that did not involve the previous body parts as the September 24, 2010 injury.

PIPS takes the position, based on the deposition testimony of Dr. Silbart, supports a partial compensable consequence of the October 14, 2011 specific injury as a result of the September 24, 2010 injury which is partially separate and distinct.

Based upon the above evidence, the Arbitrator rejects the opinion of Dr. Silbart as not being based on substantial medical evidence.  The evidence clearly supports two separate specific injuries to different parts of the body with different mechanisms of injury.

/ / /

-22-

1  The medical reports of the primary treating physician are more contemporaneous to the

2  events found to specific injuries and is better reasoned and more persuasive.

3  In the opinion of the Arbitrator, the idea that the specific injury of October 11, 2011 is a

4  compensable consequence in part of the specific injury of September 24, 2010, is not supported

5  by the facts of the case and the medical evidence.

6  **B.**

7  **Is the claim for the continuous trauma injury from August 2005 through October 14, 2011 a**

8  **compensable consequence of the specific injury of September 24, 2010, or a separate and**

9  **distinct injury?**

10  The Arbitrator finds that C▇▇▇▇ ▇ ▇▇▇▇ suffered a continuous trauma from August 2005

11  through October 14, 2011.

12  Dr. Steven Silbart in his report of May 14, 2018, finds the applicant sustained a continuous

13  trauma injury working at Beverly Hills Unified School District beginning in August 2005.

14  The physician takes a history that the applicant states that around September 24, 2010, he

15  sustained an injury.  The applicant was trying to go on top of the fence, he pulled himself up,

16  holding on to the bleachers, at which time, he felt pain in his right shoulder.

17  The applicant states that on October 14, 2011, he was shoveling fragments of turf from the

18  field and loading them into a utility cart when he started to notice discomfort in his left shoulder,

19  wrist hands and low back.

20  The applicant was present with symptoms to the cervical spine, right shoulder, left

21  shoulder, wrists, hands, lumbar sacral spine and cervical spine.

22  The physician indicated he was evaluating the applicant for a specific injury on September

23  24, 2010, October 14, 2011, as well as a continuous trauma injury.

24  The physician finds an industrial injury to the neck, low back and both wrists as a result of

25  the continuous trauma injury.

26  Dr. Steven Silbart in his report of May 25, 2018, finds as to the cervical and lumbar

27  disability is apportioned 85% to continuous trauma injury.  He did not find apportionable lumbar

28  disability relative to the October 14, 2011 specific injury.

-23-

With respect to the wrist, 70% is apportioned to the continuous trauma injury.

With respect to the right shoulder disability, all is apportioned to the September 24, 2010 specific injury and the left shoulder is apportioned entirely to the October 14, 2011 specific injury.

Based on the applicant's history and the medical report of Dr. Steven Silbart, the entire medical record, the Arbitrator finds the applicant sustained a continuous trauma from August 2005 through October 14, 2011.

PIPS agrees the applicant sustained a continuous trauma injury; however, they argue that part of the continuous trauma injury is a compensable consequence of the specific injury of September 24, 2010.

The law provides that if an applicant returns to work after an industrial injury and a new body part is injured as a result of the work, the applicant may be deemed to have suffered a separate injury. That is because it is well established that the acceleration, aggravation or lighting up of a pre-existing condition will result in a compensable injury.

In the case of *Ponce v. Barrett Business Services* (2017 Cal. Wrk. Comp. P.D. LEXIS 175) the WCAB affirmed the WCJ's finding that applicant, a truck driver, suffered cumulative industrial injury to his left wrist during the period ending on March 4, 2015 and the issue of whether wrist injury was compensable consequence of applicant's prior shoulder injury incurred at applicant's previous employment was not tried or determined.

The WCAB addressed defendant's assertion that wrist injury was compensable consequence by observing that injury is a "compensable consequence" if subsequent injury is direct and natural consequence of original industrial injury and relates back to original injury, but that acceleration or aggravation of preexisting industrial injury is compensable as a separate injury AOE/COE if aggravation is reasonably attributable to employee's subsequent employment, and WCAB found that medical evidence in this case indicated that wrist injury was due to stress on applicant's wrist because of the work he was performing for defendant, that opinion of orthopedic Qualified Medical Evaluator, Robert R. McIvor, M.D., stating that prior shoulder injury was a contributing factor regarding stress on the wrist was not inconsistent with his explanation regarding why the cumulative trauma during applicant's employment by defendant was also a contributing

-24-

factor.  The WCJ's finding of injury AOE/COE to his left wrist was consistent with medical evidence submitted at trial.

The WCAB stated in the *Ponce* case, the parties do not dispute the fact that applicant had additional stress on his left wrist as a result of his work for defendant.  However, the defendant argues that the left wrist injury is a compensable consequence of the shoulder injury and that it is not a separate injury.  An injury is a "compensable consequence" when the subsequent injury is the direct and natural consequence of an original industrial injury; the subsequent injury is considered to relate back to the original injury (e.g., *Beaty v. Workers' Comp. Appeals Bd.* (1978) 80 Cal. App. 3d 397 [144 Cal. Rptr. 78, 43 Cal. Comp. Cases 444.]

Here, applicant returned to work for defendant after recovering from his left shoulder surgery.  His left wrist injury was the result of applicant having "to adjust the way he bent down and using a ratchet binder which puts stress on his left wrist."

It is well established that the acceleration, aggravation or 'lighting up' of a preexisting condition "is an injury in the occupation causing the same." (*Tanenbaum v. Industrial Acc. Com.* (1935) 4 Cal. 2d 615, 617 [1935 Cal. LEXIS 590]; *Zemke v. Workmen's Comp. Appeals Bd.* (1968) 68 Cal. 2d 794 [33 Cal. Comp. Cases 358]; *Reynolds Electrical & Engineering Co. v. Workers' Comp. Appeals Bd.* (*Buckner*) (1966) 65 Cal. 2d 438 [55 Cal. Rptr. 254, 421 P.2d 102, 31 Cal. Comp. Cases 421].) Also, "pathology" may not be apportioned. (*Pullman Kellogg v. Workers' Comp. Appeals Bd.* (*Normand*) (1980) 26 Cal. 3d 450 [161 Cal. Rptr. 783, 605 P.2d 422, 45 Cal. Comp. Cases 170]; *Duthie v. Worker's Comp. Appeals Bd.* (1978) 86 Cal. App. 3d 721 [43 Cal. Comp. Cases 1214].)

There does not appear to be a dispute as to whether the "stress" to applicant's left wrist after he returned to work was a contributing factor regarding his wrist condition.  As noted, the acceleration or aggravation of a preexisting industrial injury is compensable as an injury arising out of and in the course of the employment, if the aggravation is reasonably attributable to the injured worker's subsequent employment (*Smith v. Workmen's Comp. App. Bd.* (1969) 71 Cal. 2d 588 [34 Cal. Comp. Cases 424].)

/ / /

Dr. McIvor and Dr. Schmidt stated that applicant's left wrist injury was a compensable consequence of the 2011 left shoulder injury. However, as noted above, Dr. McIvor explained that the wrist injury was due to stress on applicant's wrist because of the work he was performing for defendant and Dr. Schmidt agreed with that analysis. It appears that the doctors' opinions regarding what constitutes a compensable consequence are based on an inaccurate understanding of the definition of the term. It is well established that a medical report is not substantial evidence if the doctor's opinion is based on an incorrect legal theory. (*Place v. Workmen's Comp. App. Bd.* (1970) 3 Cal. 3d 372 [35 Cal. Comp. Cases 525].)

As stated above, Dr. McIvor explained and reiterated his opinion that the applicant's left wrist injury was due to stress on his wrist as a result of the work he was doing for defendant. The doctor's opinion that the prior injury was a contributing factor regarding the stress is not inconsistent with his explanation of why the cumulative trauma during applicant's employment by defendant was also a contributing factor. Under these circumstances, the finding that applicant sustained injury arising out of and occurring in the course of employment to his left wrist is consistent with the medical evidence submitted at trial. The WCAB then denied the defendant's petition.

Turning to the facts of this case and the issue of is the claim for the continuous trauma injury from August 2005 through October 14, 2011 a compensable consequence of the specific injury of September 24, 2010, or a separate and distinct injury, the Arbitrator finds that based on the facts of this, the *Ponce* case and the medical evidence that continuous trauma injury from August 2005 through October 14, 2011 is a separate and distinct injury, not a compensable consequence in whole or in part to the specific injury of September 24, 2010.

The facts and medical evidence establish that the applicant sustained a specific injury on September 24, 2010 to the right shoulder and the complaints to the cervical spine sprain/strain and inability to sleep, resolved and suffered a second specific injury on October 14, 2011.

The Arbitrator found the applicant sustained a continuous trauma claim from 2005 through October 14, 2011 to the applicant's bilateral wrists, bilateral hands, back, lumbar spine and neck.

/ / /

-26-

The evidence supports that most of the continuous trauma injury is a separate and distinct injury because it involves, for the most part, different body parts then the specific injury, a different mechanism injury then the specific injuries or, in the case, the issue of the neck following the specific injury resolved and the start date for the continuous trauma injury was in 2005 prior to either specific injury.

PIPS in their argument concedes that part of the continuous trauma injury from 2005 through October 14, 2011 is in part a separate and distinct injury.

PIPS argues that part of the continuous trauma injury is compensable consequence of the specific injury of September 24, 2010. They argue that the applicant injured his right shoulder in the September 24, 2010 specific injury causing him to overuse his left shoulder when returning to work prior to the injury of October 14, 2011, resulting in a compensable consequence injury to the left shoulder. They also argued that the cervical spine injury was the result in part of September 24, 2010 specific injury and when he returned to work, work aggravated the neck making that a compensable consequence of the September 24, 2010 specific injury.

PIPS relies on the testimony of Dr. Silbart in his deposition that part of the continuous trauma is a compensable consequence of the specific injury of September 24, 2010. Dr. Silbart, after he was appraised of the overuse of the left shoulder when applicant returned to work and the applicant exceeding work restrictions when he returned after the specific injury, apportioned the left shoulder 66% as a compensable consequence of the September 24, 2010 injury and 33.4% to the specific injury of October 14, 2011. For the wrists, he attributed 33.4% to a compensable consequence of the September 24, 2010 injury and 66.6% to the continuous trauma injury. For the lumbar spine, he attributed 66% to a compensable consequence of the September 24, 2010 injury and 33.4% to the continuous trauma.

The Arbitrator found that none of the continuous trauma injury was a compensable consequence of the September 24, 2010 injury because the law provides that an acceleration or aggravation of a preexisting industrial injury is compensable as an injury arising out of and in the course of the employment, if the aggravation is reasonably attributable to the injured worker's

/ / /

-27-

subsequent employment (*Smith v. Workmen's Comp. App. Bd.* (1969) 71 Cal. 2d 588 [34 Cal. Comp. Cases 424].

In addition, it is well established that the acceleration, aggravation or 'lighting up' of a preexisting condition "is an injury in the occupation causing the same." (*Tanenbaum v. Industrial Acc. Com.* (1935) 4 Cal. 2d 615, 617 [1935 Cal. LEXIS 590]; *Zemke v. Workmen's Comp. Appeals Bd.* (1968) 68 Cal. 2d 794 [33 Cal. Comp. Cases 358]; *Reynolds Electrical & Engineering Co. v. Workers' Comp. Appeals Bd.* (*Buckner*) (1966) 65 Cal. 2d 438 [55 Cal. Rptr. 254, 421 P.2d 102, 31 Cal. Comp. Cases 421].)

Also, "pathology" may not be apportioned. (*Pullman Kellogg v. Workers' Comp. Appeals Bd.* (*Normand*) (1980) 26 Cal. 3d 450 [161 Cal. Rptr. 783, 605 P.2d 422, 45 Cal. Comp. Cases 170]; *Duthie v. Worker's Comp. Appeals Bd.* (1978) 86 Cal. App. 3d 721 [43 Cal. Comp. Cases 1214].)

Therefore, the injury to the applicant, if in part caused by returning to work exceeding the work restriction and favoring his right shoulder resulting in an injury to his left shoulder, that injury would be a separate and distinct injury and not a compensable consequence and in part of the September 24, 2011 specific injury.

The facts establish the continuous trauma injury if caused in part as argued by PIPS would still be a separate and distinct injury because it the injury is an acceleration, aggravation or 'lighting up' of a preexisting condition and is an injury in the occupation causing the same.

The Arbitrator also finds the opinions of Dr. Silbart are not based on substantial evidence because he apportions based on an incorrect legal theory and ignores all the case law cited above.

Therefore, the facts of this case clearly establish the applicant sustained a separate and distinct continuous trauma injury from 2005 through October 14, 2011 to various body parts and the history and medical evidence does not support any part of that continuous trauma injury been a compensable consequence of the September 24, 2010 injury.

Based on the above case law and facts the continuous trauma from 2005 through October 14, 2011, was a separate injury and not a compensable consequence of the specific injury of September 24, 2010.

-28-

1  **The Arbitrator finds that the applicant sustained a specific injury on September 24, 2010, a**
2  **specific injury on October 14, 2011 and a continuous trauma from August 2005 through**
3  **October 14, 2011 all of which are separate and distinct injuries.**

4  The Arbitrator finding that the applicant sustained a specific injury on September 24, 2010,
5  a specific injury on October 14, 2011 and a continuous trauma from August 2005 through October
6  14, 2011 all of which are separate and distinct injuries is based on the discussion set forth above.

7  **If the claim for a continuous trauma injury from August 2005 through October 14, 2011 is**
8  **found to be a compensable consequence of the specific injury of September 24, 2010, are the**
9  **injuries and benefits covered by the terms of the insurance policy issued by Liberty to PIPS?**

10  The Arbitrator found as stated above that the continuous trauma injury from August 2005
11  through October 14, 2011, was a separate and district injury and not a compensable consequence
12  injury of the specific injury of September 24, 2010.

13  Therefore, this issue need not be decided.

14  However, the Arbitrator provides the following analysis on this issue.

15  The excess insurance policy issued by Liberty to PIPS provides that the loss arising from
16  bodily injury by accident or bodily injury by disease including death applies when the bodily injury
17  by accident occurs during the policy period or the bodily injury by disease is caused by or
18  aggravated by the conditions of employment. The employer's last day of last exposure to those
19  conditions causing or aggravating such bodily injury by disease must occur during the policy
20  period.

21  Liberty argues that if the continuous trauma claim was in part a compensable consequence
22  of the 2010 claim, the last day of injurious exposure causing or aggravating the bodily injury was
23  after the Liberty policy and is not covered by the terms of the policy. They argue the conditions
24  causing or aggravating such bodily injury must occur during the policy period.

25  PIPS argues that the insurance policy would cover a compensable consequence injury.
26  They argue if the secondary incident is a direct result of the compensable primary injury, the
27  secondary incident is not considered a new and independent injury and relates back to the original
28  injury.

-29-

PIPS further argues that the Liberty policy covers compensable consequence injuries based on their policy language that states law speeds amounts that you have actually paid as a self-insured under the workers' compensation law plus any expenses.

As stated above and for the reasons set forth above, the Arbitrator found the continuous trauma was not a compensable consequence of the September injury.

However, the Arbitrator indicates after reviewing all the evidence, that if the Arbitrator had found a compensable consequence injury, the Arbitrator would have found the policy covered the injury and benefits.

In the opinion of the Arbitrator, this policy based on its language is an excess policy to cover the injury during the policy period.

A compensable consequence injury by definition and by case law relates back to the original injury.

Therefore, a compensable consequence injury would be covered by this policy in the opinion of the Arbitrator.

If the applicant in this case had not returned to work and had a new separate injury, for example the applicant because of the injury had fallen at home because of the industrial injury, an otherwise nonindustrial event, that injury would become compensable and would relate back to the original injury.

In the opinion of the Arbitrator, if that is what had happened here, the policy would cover the injury for the fall at home because it relates back to the original injury and the policy covers the loss arising from bodily injury by accident or bodily injury by disease including death when the bodily injury by accident occurs during the policy period or the bodily injury by disease is caused by or aggravated by the conditions of employment.

Because the original injury occurred during the policy injury and in a compensable consequence injury, the second injury relates back to the first injury, the policy would cover the compensable consequence injury.

However, again as stated above, the Arbitrator in this case found no compensable consequence injury as a result of the specific injury of September 24, 2010.

-30-

**If the claim for a continuous trauma injury from August 2005 through October 14, 2011 is found to be a compensable consequence of the specific injury of September 24, 2010, did PIPS release the claim by way of settlement?**

The Arbitrator does not decide this issue as the Arbitrator found that the trauma claim is not a compensable consequence of September 24, 2010 injury making this issue.

However, the Arbitrator provides the following analysis on this issue.

The parties stipulate that PIPS and Liberty entered into a settlement agreement dated April 1, 2019, wherein PIPS released "any and all cumulative injury claims ('CT Claims') wherein the claimant's last day of last exposure ('LDLE') to those conditions causing or aggravating the cumulative injury occurred after the expiration date of the Liberty policy, July 1, 2011."

The Arbitrator, after reviewing the settlement agreement, is of the opinion that the stipulation above is the only part of the settlement agreement that applies to these cases.

After reviewing the settlement agreement, it is of the opinion that other than the above settlement agreement between PIPS and Liberty did not settle any other issues that impacted this case.

**If the claim for the specific injury of October 14, 2011 is found to be a compensable consequence of the specific injury of September 24, 2010, are the injuries and benefits covered by the terms of the insurance policy issued by Liberty to PIPS?**

The Arbitrator finds that if any specific injuries were found to be a compensable consequence of the original injury and not a separate and distinct injury, as the Arbitrator found here, the opinion of the Arbitrator although would be that the policy would cover an injury that compensable consequence injury because the injury relates back to the original injury.

**Is PIPS entitled to prejudgment interest pursuant to Civil Code Section 3287?**

Civil Code Section 3287 provides a follows:

(a)    A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of

-31-

1  damages and interest from any debtor, including the state or any county, city, city and county,

2  municipal corporation, public district, public agency, or any political subdivision of the state.

3        (b)     Every person who is entitled under any judgment to receive damages based upon a

4  cause of action in contract where the claim was unliquidated, may also recover interest thereon

5  from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event

6  earlier than the date the action was filed.

7        (c)     Unless another statute provides a different interest rate, in a tax or fee claim against

8  a public entity that results in a judgment against the public entity, interest shall accrue at a rate

9  equal to the weekly average one-year constant maturity United States Treasury yield, but shall not

10  exceed 7 percent per annum.  That rate shall control until the judgment becomes enforceable under

11  Section 965.5 or 970.1 of the Government Code, at which time interest shall accrue at an annual

12  rate equal to the weekly average one-year constant maturity United States Treasury yield at the

13  time of the judgment plus 2 percent, but shall not exceed 7 percent per annum.

14       The Arbitrator finds based on the cases interpreting Civil Code Section 3287 pre-judgment

15  interest is not applicable to his case because of the disputed facts and law.

16       The Arbitrator finds that the section only applies if a person who is entitled to recover

17  damages certain, or capable of being made certain by calculation,

18       In the opinion of the Arbitrator, the damages are not certain or capable of being made

19  certain by calculation until the factual and legal issues were decided in this case.

20       The amount of damages would differ based on the findings on the disputed issues.

21       Therefore, the Arbitrator finds PIPS is entitled to prejudgment interest pursuant to Civil

22  Code Section 3287.

23       **Is the Stipulations with Request for Award entered into between PIPS and the**

24  **applicant, C⬛⬛⬛⬛ E⬛⬛, inconsistent with PIPS's position that the specific injury of**

25  **October 14, 2011, and the continuous trauma injury from August 2005 through October 14,**

26  **2011, are compensable consequences of the specific injury of September 24, 2010?**

27       This issue is moot based on the findings above.

28       However, the Arbitrator provides the following opinion on the issue.

-32-

The Arbitrator is of the opinion that PIPS is bound by their Stipulations and Awards in the underlying workers' compensation case.

In the opinion of the Arbitrator, an excess insurance policy is for injuries during the policy period.

In this case, the applicant and defendant, PIPS, settled all three underlying workers compensation cases.

The settlement between the applicant and PIPS regarding the injury of September 24, 2010 was within the policy period of Liberty.

In the opinion of the Arbitrator, an excess insurance policy is related to injuries during the excess policy term.

In the opinion of the Arbitrator, Stipulations with Request for Award between the applicant and the holder of the excess policy, here PIPS, establishes their agreement to pay benefits for applicant's injuries.

PIPS entered s into Stipulations with Request for Award agreeing to various stipulations with the applicant including benefits to be paid.

In the opinion of the Arbitrator, PIPS is bound by those Stipulations with Request for Award approved by the Appeals Board as they establish the basis for recovery in the excess insurance policy.

However, in this case because of the early findings, this is just an opinion and is moot regarding this case.

DATED:  July 26, 2023                    ALTMAN, BLITSTEIN & BLINDER

By: _____

MARK L. KAHN,
ARBITRATOR

-33-

ALTMAN BLITSTEIN ENCINO
LETICIA LOZANO
(818) 995-0080
leticia.lozano@altmanlaw.com

**PROOF OF SERVICE**
(CCP §1013a(3))

**STATE OF CALIFORNIA**          )
                                 )
**COUNTY OF LOS ANGELES**        )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 16255 Ventura Boulevard, Suite 1110, Encino, California 91436.

On July 26, 2023, I served the foregoing document described as **ARBITRATOR'S OPINION ON DECISION; ARBITRATOR'S FINDINGS** on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

Albert Haverkamp, Esq.              Yvonne Schulte, Eq.
Haverkamp Law Firm                 Clyde & Co
2211 Encinitas Boulevard, Suite 225   355 S. Grand Avenue, Suite 1400
Encinitas, CA 92024                Los Angeles, CA 90071

I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Encino, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on July 26, 2023 at Encino, California.

LETICIA LOZANO

- 1 -